UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JOSHUA HOWARD

                              Plaintiff,

         v.                                              Case No. 17-cv-325-pp

SAMUEL GRIESER, *et al.*,

                              Defendants.

---

**ORDER DENYING DEFENDANTS' MOTION FOR LEAVE TO FILE AN AMENDED ANSWER (DKT NO. 50), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT NO. 53) AND DISMISSING CASE**

---

On March 6, 2017, the plaintiff, representing himself, filed this lawsuit under 42 U.S.C. §1983, alleging that defendants Samuel Grieser and Donna Larson violated his constitutional rights when they were deliberately indifferent to his back injury; he also alleged that former defendant Belinda Schrubbe and Larson retaliated against him. Dkt. No. 1. The defendants moved for partial summary judgment on the retaliation claims, arguing that the plaintiff had failed to exhaust his administrative remedies. Dkt. No. 31. The court granted that partial motion and dismissed Schrubbe from the case. Dkt. No. 49. The defendants then moved for summary judgment on the merits of the remaining Eighth Amendment Claims. Dkt. No. 53. The defendants also moved for leave to amend their answer to add an affirmative defense stating that the plaintiff's claims are barred by the statute of limitations. Dkt. No. 50. The court will deny the defendants' motion for leave to amend their answer because the

1

amendment would be futile, given that the court will grant defendants' motion for summary judgment and dismisses the case.

## I.    Motion for Leave to File an Amended Answer (Dkt. No. 50)

The defendants asked to amend their answer to include an affirmative defense based on the statute of limitations. Dkt. No. 50. "The court should freely give leave [to file an amended answer] when justice so requires." Fed. R. Civ. P. 15(a)(2). "The Supreme Court has interpreted this rule to require a district court to allow amendment unless there is a good reason—futility, undue delay, undue prejudice, or bad faith—for denying leave to amend." Liebart v. SPX Corp., 917 F.3d 952, 964 (7th Cir. 2019) (quoting Life Plans, Inc. v. Sec. Life of Denver Ins. Co., 800 F.3d 343, 357 (7th Cir. 2015)).

The summary judgment documents demonstrate that allowing the amendment would be futile because the plaintiff timely filed his complaint. The plaintiff filed the complaint on March 6, 2017. Dkt. No. 1. The defendants assert that it is undisputed the plaintiff's claims concern events that took place between January 3 and January 11, 2011. Dkt. No. 51 at 1. "An action under 42 U.S.C. § 1983 must be brought within the statute of limitations for personal injuries supplied by the state in which the claim arose." Huber v. Anderson, 909 F.3d 201, 207 (7th Cir. 2018) (citing Wallace v. Kato, 549 U.S. 384, 387 (2007)). In Wisconsin, that statute is Wis. Stat. §893.53 (2016), *amended by* 2017 Wis. Actt 235 (eff. April 5, 2018) (reducing applicable statute of limitations from six years to three years). Id. In 2011, when the events that

gave rise to the plaintiff's claims occurred, limitations period was six years. Id.
In their brief in support of their motion for summary judgment, the defendants
asserted that the plaintiff's complaint is time-barred because he filed his
complaint a little over six years after the events alleged in it. Dkt. No. 54 at 8.

Six years from January 11, 2011 was January 11, 2017, and the plaintiff
did not file his compliant until March 6, 2017—about two months later. In his
response brief, the plaintiff did not dispute that he filed the complaint more
than six years after the events it describes. Dkt. No. 69 at 7. He cited Johnson
v. Rivera, 272 F.3d 519, 522 (7th Cir. 2001), however, pointing out that
"federal courts must toll the limitations period while a prisoner completes the
administrative process." Dkt. No. 69 at 7. He explains that he filed four inmate
complaints about the events described in the complaint, and that he received
the final decisions on those complaints on March 6 and March 13, 2011. Id.
The defendants did not respond to this argument in their reply brief, but in
their response to the plaintiff's proposed findings of fact they state that they do
not dispute for the purposes of summary judgment that the plaintiff received
the final decisions on his inmate complaints on March 6, 2011 and March 13,
2011. Dkt. No. 77 at ¶¶ 82-84.

The plaintiff is correct that federal courts must toll the statute of
limitations period while he exhausts his administrative remedies.  See Givens
v. Luedtke, 587 F. Appx. 979, 981 (7th Cir. 2014) (citing Johnson 272 F.3d at
521-22.) Because the defendants do not dispute that the plaintiff did not

receive the final decisions on his grievances until March 6 and 13, 2011, the court must toll the statute of limitations until March 6 at the earliest. Six years from March 6, 2011 is March 6, 2017—the date on which the plaintiff filed his complaint.

The plaintiff's complaint is timely and allowing the defendants to amend the complaint to add an affirmative defense related to statute of limitations would be futile. The court denies the defendants' motion.

## II.    Defendants' Motion for Summary Judgment (Dkt. No. 53)

### A.    Facts

In 2001, the plaintiff sustained a back injury from a car accident that left him with chronic back pain. Dkt. No. 77 at ¶1.[1] The plaintiff has been incarcerated within the Wisconsin Department of Corrections (DOC) for several years, and various DOC medical professionals have treated his chronic back pain. Id. at ¶¶7-10, 16, 18-20. Typically, when his back pain lasted more than a few days, the plaintiff asked a sergeant to call the Health Services Unit (HSU), and he would be seen that same day. Id. at ¶¶16-17.

In January 2011, the plaintiff was incarcerated at Waupun Correctional

---

[1] The first twenty-three paragraphs of the plaintiff's proposed findings of fact lay out the history of his back problems, discuss DOC policy and provide the plaintiff's version of how prison staff have dealt with his back issues over the years. Dkt. No. 70 at ¶¶1-23. The defendants objected to these proposed facts as "immaterial" because they were not issues of material fact that might affect the outcome of the lawsuit. Dkt. No. 77 at ¶¶1-23. The court has not relied on these facts to decide whether the defendants are entitled to summary judgment on the plaintiff's claims, but the facts do provide a bit of background for what occurred in January 2011.

4

institution. Dkt. No. 55 at ¶1. On January 3, 2011, when the plaintiff pushed his foot-locker back under his bed, "he felt a sharp pain going up his back from his hip area where it felt like it was bone-on-bone." Dkt. No. 77 at ¶24.[2] He laid down and waited until dinner time, when he would be able to talk to an officer. Id. Officer Manthei (not a defendant) was working on the plaintiff's range; when he reached the plaintiff's cell door, the plaintiff informed Manthei that his back had gone out, and he needed to go to HSU. Id. at ¶25. Manthei told the plaintiff he would let the sergeant know. Id. At 4:45 p.m., Sergeant Congleton[3] (not a defendant) called HSU and left a message informing HSU that the plaintiff had asked to be seen because of his back going out. Id. at ¶¶25-26; Dkt. No. 55 at ¶30.

The HSU manager, former defendant Schrubbe, identified defendant Donna Larson as the person who responded to Congleton's message January 3, 2011. Dkt. No. 77 at ¶28. At the time, Waupun's HSU was short-staffed, and there was only one registered nurse on duty. Id. at ¶27. According to Larson, while she does not specifically recall the events of January 3, it was likely a busy night if the sergeant had to leave a message (which would mean that the

---

[2] The defendants posed technical objections to several of the plaintiff's proposed findings of fact relating to the events that occurred in January 2011, but did not dispute the facts "for the purposes of summary judgment." Dkt. No. 77.

[3] At screening, the court allowed the plaintiff to proceed on a deliberate indifference claim against Sgt. Grieser for the events of January 3, 2011 and the events of January 7-11, 2011. Dkt. No. 15 at 7. It is undisputed that Grieser did not work on January 3, 2011. Dkt. No. 71 at ¶4.

5

nurse didn't answer the phone) and she indicated that not answering the phone "could have been a form of triaging while dealing with the medical needs of other inmates and prioritizing any emergent care situation." Dkt. No. 55 at ¶¶31-32. Larson indicated that, while she did not remember Congleton's phone message, when she evaluated a phone message from security about an inmate who was asking for medical attention, it was her "general practice" to pull the inmate's medical chart and review it before calling back. Id. at ¶31. She said that once she reviewed the chart and called the unit back, she'd ask the officer what he'd observed; she said if the inmate was complaining about a chronic issue and there were no signs that urgent care was necessary, she "likely" would have ordered ice and told the inmate to submit a health services request. Id. at 33. The plaintiff objects that there is no evidence that Larson reviewed his chart—if she had, she would have seen the kind of care he'd been given in prior situations and prescribed it. Id.

Larson stated she would not have considered plaintiff's back injury as an emergent situation; she indicated that ice and rest are the first course of treatment for back pain and that it was her practice to try the most conservative, least invasive course of treatment first. Id. at ¶34. The plaintiff objects that his back going out had been treated as an emergent situation in the past, and that Larson is the only member of the HSU staff who waited several days before getting him treatment. Id.

According to the plaintiff, Larson called Congleton back forty-five

minutes later recommending ice and asking that Congleton give the plaintiff an HSR form. Dkt. No. 77 at ¶34. Officer Manthei took the HSR form to the plaintiff in his cell, informing the plaintiff HSU had said that his situation was not an emergency and that he needed to fill out the form. Id. at ¶35. The plaintiff "was in disbelief that HSU refused to see him considering that they had always done so in the past when his back went out." Id. The plaintiff asserted that when he asked Manthei how HSU could determine whether it was an emergency when Manthei was the only person to whom the plaintiff had spoken and Manthei didn't ask him any questions, Manthei "gave him a sympathetic shrug and walked away." Id. The plaintiff alleged that about an hour later, Manthei gave him some ice—saying that that was all the HSU would approve—at which time the plaintiff told Manthei that HSU was going to have to put the plaintiff on "sick-cell" because he could not go to the dining hall for meals. Id. at ¶36. Officer Manthei later gave the plaintiff a "lay-in tag;" lay-in status excuses inmates from work and allows them to receive meals in their cells. Id. at ¶38.

The plaintiff remained on lay-in status the entire day January 4, 2011 and took all three meals in his cell; he says he had no access to a hot compress, Tylenol or pain-relieving balm. Id. at ¶39. On January 5, he remained on lay-in status for the first shift, but he received a library pass in the afternoon. Id. at ¶40. When the plaintiff asked Manthei how he had received a pass on lay-in status, Manthei told him that defendant Sergeant

Samuel Grieser had taken him off lay-in status. Id. Because the plaintiff had been lying still for two days, he decided to go to the library. Id. at ¶41. According to the plaintiff, this activity "caused his back muscles to stiffen up and he started to experience muscle spasms even when laying down." Id. at ¶42.

When it came time for dinner, the plaintiff asked Manthei if he could have dinner in his cell. Id. at ¶44. Manthei responded that Grieser had decided not to put the plaintiff back on lay-in status because he was able to walk to the library. Id. The plaintiff states that he went without dinner and was put back on lay-in the next morning. Id. at ¶45. According to the plaintiff, because he had been on lay-in status for three consecutive days, he assumed that he would be seeing HSU. Id. at ¶46. The plaintiff described an earlier incident of his back going out in which this had been his experience. Id. at ¶20.

When HSU still had not come to his cell by Friday, the plaintiff decided to go to the sergeant's cage. Id. at ¶48. The plaintiff asked Grieser to call HSU; when Grieser asked why, the plaintiff said it was for his back and that he could not wait until Monday to be seen. Id. at ¶49. According to the plaintiff, Grieser told him that it was not an emergency or "life or death" and told him to file a "blue slip"—a health services request. Id. at ¶¶50-51. The plaintiff says that Grieser also refused to call a supervisor and ordered the plaintiff to return to his cell. Id. at ¶51. The plaintiff returned to his cell and filled out and submitted the HSR form. Id. at ¶52 On the form, the plaintiff indicated his

8

situation was an emergency and that the sergeant refused to call HSU or call a supervisor. Id. at ¶52. According to Grieser, while he did not recall the plaintiff approaching him about back pain on January 7 or whether he contacted the HSU, his usual practice was to determine whether there was a possible emergency situation; if the inmate was in obvious distress or the inmate could not contact HSU himself due to obvious discomfort, Grieser would have called HSU. Dkt. No. 55 at ¶¶14-15. If an inmate could move on his own and was able to submit an HSR, the defendants indicate that "it is likely" Grieser would have directed the inmate to do so. Id. at ¶16.

The plaintiff also states that Grieser did not put him back on lay-in status; the plaintiff does not explain whether he asked Grieser to put him back on lay-in status. Dkt. No. 77 at ¶53. The plaintiff states that when Grieser refused to call HSU because it was not an emergency, the plaintiff argued that it was an emergency because he would not be able to go to the chow hall for meals or come out for medicine. Id. at ¶50. The plaintiff further states that Grieser "was aware that the plaintiff had been on lay-in status during the week for his back pain, that the plaintiff had asked to go to HSU because he was not going to be able to go to the chow hall or get his meds over the weekend and that the plaintiff had not gone to the chow hall for dinner. Despite having this information, Grieser did not place the plaintiff on lay-in." Id. at ¶53.

The plaintiff remained in his bed the rest of January 7 and all day January 8. Id. at ¶54. He alleges that by Sunday, January 9, he was starving

because he had not eaten in two days; he asked the first shift sergeant to place him back on lay-in status, and the sergeant granted the request. Id.

On Monday, January 10, the plaintiff remained on lay-in status but again received a library pass. Id. at ¶55. According to the plaintiff, Manthei told him that he had received a library pass because Grieser wanted to see if he would use it. Id. The plaintiff alleges that he was "not in any shape" to go to the library and that he told Manthei that he expected to go to the HSU at some point. Id. Manthei later came by and told the plaintiff that he was scheduled to go to the HSU the next day. Id. at ¶56. On Monday evening, the plaintiff decided to take a shower, because the hot water would help his back pain and because he had not had a shower in over a week. Id. at ¶57.

According to the defendants, HSU received the plaintiff's HSR form on January 9, 2011, and Nurse Jackson (not a defendant) responded stating that the plaintiff would be seen on a sick call. Dkt. No. 55 at ¶¶36-37. Larson saw the plaintiff on January 11, 2011. Id. at ¶38. The plaintiff told Larson that his back "felt like a 'red poker that went up his back' and he felt numbness and tingling on January 4. He reported his pain was now at a 2 out of 10 and that he was in no pain when lying flat." Id. Based on her observations in the examination, "Larson ordered ibuprofen, ice four times a day, rest and stretching exercises. She provided the plaintiff a handout on the exercises. She ordered an extra pillow restriction to put under his knees to alleviate pressure on his back for January 11 to January 25 and put him on sick cell status to

10

rest his back from January 11 to January 19." Id. at ¶39. Sick cell status restricts an inmate to his cell and allows for meals to be brought directly to the inmate's cell. Id. at ¶40. Larson also indicated that the plaintiff should be scheduled with a doctor to address his chronic back pain. Id. at ¶39. After January 11, 2011, Larson did not personally treat the plaintiff for back pain again, though the plaintiff did see other members of the HSU staff. Id. at ¶41. The plaintiff alleges that the "delayed treatment was unsuccessful," and that "a few days" later, he "suffered a secondary injury" to his back. Dkt. No. 77 at ¶60. He claims that he continued to experience back problems in the ensuing years. Id. at ¶63.

B. Discussion

1. *Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

## 2.    *Deliberate Indifference to Medical Needs Standard*

The plaintiff claims that the defendants violated his Eighth Amendment rights when they delayed sending him to the HSU until January 11, 2011. A prison official violates the Eighth Amendment where he is deliberately indifferent "to serious medical needs of prisoners." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008). "A medical need is sufficiently serious if the plaintiff's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" Roe v. Elyea, 631 F.3d 843 857 (7th Cir. 2011) (quoting Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005)). The condition does not need to be life-threatening to be serious; it needs only to be "a condition that would result in further significant injury or unnecessary and wanton infliction of pain" if not addressed. Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir. 2010). Because the parties do not argue over whether the plaintiff's back pain is a serious medical condition, the court will assume, for the purpose of its analysis, that the plaintiff suffers from an objectively serious medical condition. See Pyles v. Fahim, 771 F.3d 403, 411 (7th Cir. 2014).

A plaintiff must also allege "that an official *actually* knew of and disregarded a substantial risk of harm." Petties v. Carter, 836 F.3d 722, 728

(7th Cir. 2016). The plaintiff "must show more than mere evidence of malpractice." Id. He must show that the prison official's choices "were so 'significant a departure from accepted professional standards or practices' that it is questionable whether they actually exercised professional judgment." Stallings v. Liping Zhang, 607 F. Appx. 591, 593 (7th Cir. 2015) (quoting Pyles, 771 F.3d at 409). These choices include where a prison official fails to act or do anything to address the serious medical need. See Gayton, 593 F.3d at 623-624 (reversing summary judgment in favor of a nurse who refused to examine or treat a vomiting inmate). They also include where an official delays necessary treatment, aggravating a condition or needlessly prolonging a plaintiff's pain. Gomez v. Randle, 680 F.3d 859, 865-66 (7th Cir. 2012).

### 3. *Deliberate Indifference Claims Against Sgt. Grieser*

At screening, the court allowed the plaintiff to proceed on deliberate indifference claims against Grieser in two specific instances: "(1) Grieser failed to obtain medical treatment for the plaintiff between January 3 through January 6, 2011, when the plaintiff was in too much pain to leave his cell; and (2) Grieser refused to place him on lay-in status on January 7 and 8, 2011, despite the fact that the plaintiff was in too much pain to leave his cell to get his meals." Dkt. No. 15 at 7. The court did not allow the plaintiff to proceed on a claim based on his allegations that Grieser refused to call HSU on the morning of January 7, 2011, because the plaintiff alleged that he had left his cell and therefore was able to submit an HSR form. Id.

13

> a. Grieser's Alleged Failure to Obtain Medical Treatment for Plaintiff between January 3 through January 6, 2011.

Regarding January 3, 2011, it is undisputed that Grieser was not on duty that day. Dkt. No. 71 at ¶4. Liability under §1983 "requires personal involvement in the alleged constitutional deprivation." Colbert v. City of Chi., 851 F.3d 649, 657 (7th Cir. 2017). Because Grieser was not at work on January 3, 2011, he is not liable for failing to address the plaintiff's medical needs on that day.

The undisputed facts also show that the plaintiff left his cell to go to the library on January 5, 2011. Dkt. No. 77 at ¶¶40-41. In its screening order, the court emphasized that the plaintiff's claims hinged on his allegations that he was immobile, and that Grieser ignored that immobility. There is no genuine dispute of material fact as to whether Grieser was deliberately indifferent to the plaintiff's needs by requiring the plaintiff to fill out and submit an HSR form on January 5 and January 6 instead of calling HSU on the plaintiff's behalf. The undisputed facts show that the plaintiff was mobile and capable of submitting the form.

As for January 4, there is no evidence that Grieser knew that the plaintiff was immobile or in such intense pain that he could not fill out and submit an HSR form or needed immediate medical attention. There is nothing in the record demonstrating that the plaintiff asked Grieser to call HSU on January 4 or that the plaintiff informed Grieser that his situation was an emergency.

14

"Officials can avoid liability by proving they were unaware even of an obvious risk to inmate health or safety." Petties, 836 F.3d at 728. Viewing the facts in the light most favorable to the plaintiff, the plaintiff states he typically waited a few days to see if his back pain would subside, and if it didn't, he would then ask a sergeant to call HSU. Dkt. No. 77 at ¶¶16-17.

No reasonable factfinder could conclude that Grieser was deliberately indifferent to the plaintiff's medical needs from January 3 through January 6, 2011. Grieser was not working on January 3, and for January 4 through January 6, there is no evidence that Grieser knew that the plaintiff was immobile and could not submit an HSR form. The evidence, even when considered in a light most favorable to the plaintiff, demonstrates that the plaintiff was mobile and capable of submitting an HSR form. The court grants summary judgment in Grieser's favor for the claim relating to these allegations.

> b.   Grieser's Alleged Refusal to Place Plaintiff on Lay-in Status on January 7 and 8.

To prevail on an Eighth Amendment claim, the plaintiff must show that that Grieser denied him "the minimal civil measure of life's necessities." Gillis v. Litscher, 468 F.3d 488, 491 (7th Cir. 2006) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). This includes adequate food and medical care. Farmer v. Brennan, 511 U.S. 825, 832 (1994). The plaintiff must show that Grieser knew the plaintiff faced a "substantial risk of serious harm" and "disregard[ed] that risk by failing to take reasonable measures to abate it." Gillis, 468 F.3d at 491.

15

Where a plaintiff misses meals because of his choice not to comply with a rule, there is no Eighth Amendment violation. See Rodriguez v. Briley, 403 F.3d 952, 952 (7th Cir. 2005) (holding there was no Eighth Amendment violation where a plaintiff missed meals because he refused to comply with a rule to store belongings in a storage box); Freeman v. Berge, 441 F.3d 543, 544-45 (7th Cir. 2006) (finding that the plaintiff "was the author of his deprivation rather than a victim of punishment" where he refused to wear pants when his meals were delivered). Where a plaintiff does not control the circumstances under which he misses a meal, however, there may be an Eighth Amendment violation, and the court should consider whether there is genuine dispute of material fact as to whether the defendants were deliberately indifferent to him. See McDaniel v. Meisner, No. 14-cv-53-pp, 2016 WL 1261091 at * 10 (E.D. Wis. March 30, 2016).

In McDaniel, the plaintiff alleged that he could not walk to the day room to get his meals and medication because of excruciating pain and a fear that he would fall down the stairs. Id. There also was evidence in the record that the defendant officers knew the plaintiff was missing meals for several days, knew why he was missing meals and knew that HSU had not treated the plaintiff or ordered lay-in status despite the plaintiff's several requests. Id. at *12. The court denied summary judgment in favor of the defendant officers because there was a material question of fact as to whether the officers were deliberately indifferent to the plaintiff's needs. Id.

16

The plaintiff's situation is different. By his own admission, the plaintiff was mobile as early as January 5, and had walked to the sergeant's cage on January 7. The plaintiff could have filed out an HSR request on January 3 after he was given the form by Manthei. He could have filled out a form on January 5 on his way to the library. He did not.

The plaintiff has not alleged that he asked Grieser to place him on lay-in status. The plaintiff implies that Grieser should have known to place him on lay-in status without the plaintiff having to ask—he states that Grieser was aware the plaintiff had been on lay-in status earlier in the week and that the plaintiff told Grieser that unless he called HSU, the plaintiff would not be able to go to the chow hall. But the plaintiff never states that he asked Grieser to put him back on lay-in status, and never asserts that Grieser refused despite knowing the plaintiff's condition. Grieser had seen the plaintiff go to the library and walk to the sergeant's cage; this would indicate to Grieser that the plaintiff was capable of moving from one point to another. The plaintiff does not explain why Grieser should have known that the plaintiff could not go to the dining hall when the plaintiff was able to go to the library.

An official "must know of and disregard an excessive risk to inmate health; indeed, they must 'both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and 'must also draw the inference.'" Greeno, 414 F.3d at 653 (quoting Farmer, 511 U.S. at 837.) The facts, even viewed in the light most favorable to the plaintiff, do not

demonstrate that Grieser was aware of facts from which he could draw an inference that the plaintiff was not able to get to the dining hall for meals.

No reasonable factfinder could conclude that Grieser knew of an excessive risk of harm and deliberately disregarded it. The court grants summary judgment in Grieser's favor and dismisses the claims against him.

### 4.    *Deliberate Indifference Claims against Nurse Larson*

The plaintiff claims that Nurse Larson violated his Eighth Amendment rights when she refused to see him until he completed an HSR form, despite the fact that she knew the plaintiff was in too much pain to leave his cell. Viewing the facts in a light most favorable to the plaintiff: on January 3, 2011, Larson appears to have determined that the plaintiff's condition was not urgent and recommended he follow Waupun's policy to submit an HSR form to make an appointment with HSU. Dkt. No. 55 at ¶¶33-34. She also recommended ice. Id. These are treatment decisions, and "[b]y definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." Zaya v. Sood, 836 F.3d 800, 805 (7th Cir. 2016). Only where a medical professional's "chosen 'course of treatment' departs radically from 'accepted professional practice,'" may a factfinder "infer from the treatment decision itself that no exercise of professional judgment actually occurred." Id. (quoting Pyles, 771 F.3d at 409).

The plaintiff has not demonstrated that Larson's course of treatment on

18

January 3 departed radically from accepted professional standards. At most, he argues that her course of action departed from the way HSU had responded to his back pain in the past, but this is not enough to establish deliberate indifference. The plaintiff disagrees with Larson's course of action, but "mere disagreement with a medical provider's course of treatment is generally insufficient to show deliberate indifference." Garcia v. Armor Corr. Health Srvs., Inc., 788 F. App'x. 393, 395 (7th Cir. 2019).

Larson also gave the plaintiff a reasonable opportunity to make an appointment with HSU on January 3. Once the plaintiff submitted the HSR form, he had an appointment with HSU in a matter of days. The evidence indicates that the plaintiff is responsible for the delay in seeing the HSU because he did not fill out the HSR form until January 7, 2011. Had he filled out the HSR form earlier, either on January 3 when Manthei gave him the form or January 5 on his way to the library, he may have seen HSU earlier than January 11. No reasonable factfinder could conclude that Larson was deliberately indifferent to the plaintiff's needs.

Because there are no genuine issues of material fact as to whether the defendants were deliberately indifferent, the court grants summary judgment in their favor. The defendants also argued that they were entitled to qualified immunity. Because the court is granting summary judgment on the merits, the court will not address the qualified immunity argument.

### III. CONCLUSION

The court **DENIES** the defendants' motion for leave to file an amended answer. Dkt. No. 50

The court **GRANTS** the defendants' motion for summary judgment Dkt. No. 53.

The court **DISMISSES** this case. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this

deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 2nd day of February, 2021.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**